J-S17031-24

**fNON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.R.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 714 EDA 2024 |

Appeal from the Decree Entered February 28, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000512-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: B.V.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.R.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 715 EDA 2024 |

Appeal from the Decree Entered February 29, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000513-2023

BEFORE:  BOWES, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 18, 2024**

C.R.D. (Mother) appeals from the decrees involuntarily terminating her parental rights to her sons, B.A.D. and B.V.F. (collectively, Children).  We affirm.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

B.A.D. was born in September 2020, and B.V.F. was born in May 2022. In 2021, when B.A.D. was ten-months old, he sustained a fractured skull and

brain bleed after he fell from the bed he shared with Mother. N.T., 2/28/24, at 21. After this incident, Mother accepted services from the Philadelphia Department of Human Services (DHS).

Mother gave birth to B.V.F. in May 2022. In August 2022, B.V.F. suffered seizures caused by malnutrition. *Id.* at 40. Mother had been feeding B.V.F. water after she ran out of formula. *Id.* at 10, 40. The Children's Hospital of Philadelphia certified this incident as a "near-fatality." *Id.*

The trial court adjudicated Children dependent on October 21, 2022. Both Children were placed in kinship care with their foster parent, where they continue to reside. *Id.* at 40. The foster parent is a pre-adoptive resource. *Id.* at 59.

On December 21, 2023, DHS petitioned to terminate Mother's parental rights. The trial court held a hearing on February 28, 2024. DHS presented four witnesses: DHS representative, Laura DeRiggi; licensed psychologist, Dr. Emily Salima; Community Umbrella Agency (CUA)[1] supervisor, Greg Williams; and CUA case manager, Nasiya Dennis-Walton. Mother testified in opposition to termination.

Ms. DeRiggi conducted an initial home visit in 2021. *Id.* at 7. She explained that Mother has been diagnosed with fetal alcohol syndrome, bipolar disorder, and mood disorder. *Id.* at 7-9, 13. Ms. DeRiggi described Mother as "intellectually disabled" and "not able to handle a lot of complicated things"

---

[1] CUA works with DHS to provide services.

due to "expressive language disorder and processing challenges." *Id.* at 7. Ms. DeRiggi opined that Mother "would need help" parenting. *Id.* at 12.

Dr. Salima testified to performing a parenting capacity evaluation (PCE) of Mother on July 28, 2023.[2] *Id.* at 18. She stated that Mother required "intensive services" because of "capacity deficits." *Id.* at 23, 35. Dr. Salima expressed concern about Mother's capacity to parent despite Mother's participation in various services. *Id.* at 27. She opined that "support needs to be provided on an ongoing basis." *Id.* at 28. Dr. Salima explained that Mother "needs somebody appointed to help her through her day-to-day activities, both for herself and for the [C]hildren." *Id.* at 23.

Dr. Salima was specifically concerned about Mother having unsupervised visitation with Children. *Id.* at 29. She specified:

> [M]y concerns relate to problem-solving and unexpected situations … if an unexpected emergency or urgent matter, or change in the [C]hildren's well-being occurred, [I am concerned about Mother's] ability to identify and resolve those situations immediately and effectively.

*Id.* In addition, Dr. Salima relayed that Mother was "concerned about becoming overwhelmed with caring for both [C]hildren." *Id.* at 31. Dr. Salima opined that Mother's incapacity prevents her from providing necessary and appropriate care for Children. *Id.*

Mr. Williams, the CUA supervisor, testified to being involved with the case from September 2022 to November 2023. *Id.* at 39. Mr. Williams

_____

[2] Dr. Salima did not interview or evaluate the Children. *Id.* at 34.

recounted B.V.F. being malnourished and having seizures as a result of Mother not having formula and feeding him water. *Id.* at 41. According to Mr. Williams, Mother "really didn't understand … why it was wrong." *Id.* Mr. Williams stated:

> [Mother was] to comply with all the court orders and CUA services, to ensure … she attends Family School, to comply with supervised visits with [foster parent], to attend and complete [Achieving Reunification Center (ARC) programs] for parenting, housing, employment when appropriate, and to … continue attending her therapy and medication management, and to complete a PCE evaluation….

*Id.* at 43.

Mr. Williams could not recommend that Mother have unsupervised visitation with Children. *Id.* at 43-44. He stated that Mother "still was having issues or trouble with ensuring that [C]hildren were properly fed," and "redirect[ing] [C]hildren when they are having issues." *Id.* at 46. He explained:

> [M]other still has reluctancy and issues with parenting both [C]hildren at the same time. [Mother] can become overwhelmed when one child may be … acting up, and she may disengage, or one child might fall by the wayside.

*Id.* at 44.

Mr. Williams testified that although Mother had complied with her case objectives, her progress was "moderate." *Id.* at 53. He described the Children as viewing their foster parent as their mother. *Id.* at 58. Mr. Williams opined that termination would best serve Children's needs and welfare. *Id.* at 57-60.

Ms. Dennis-Walton testified to succeeding Mr. Williams as the CUA case manager. *Id.* at 67. She confirmed there "is not really an issue with [M]other's compliance." *Id.* at 71-72. Ms. Dennis-Walton observed the Children at home with their foster parent, and opined that Children were bonded with the foster parent and would be negatively impacted if removed from their placement. *Id.* at 73.

Mother testified in opposition to termination. Mother confirmed she has fetal alcohol syndrome, depression, and anxiety. *Id.* at 91. She stated that she has difficulty with "learning and comprehending" what people say. *Id.* at 92. Mother emphasized that she would do "whatever it takes to get [C]hildren back." *Id.* at 84. She testified about completing services and being bonded with Children. *Id.* at 84-86. However, Mother conceded that Children "look at … foster parent … as mom." *Id.* at 93. Mother stated that termination would "not hurt [Children], but it will affect me in the long run." *Id.*

At the close of evidence, counsel for DHS advocated for termination on "the basis of [Mother's] failure to perform parental duties." *Id.* at 96. Counsel argued:

> The testimony presented today evidenced that while [Mother] has been compliant with her objectives and doing what case managers have asked, she's not gotten herself into a position to independently perform her parental duties for [C]hildren.
>
> ***
>
> [Children] have been in care for approximately 16 months now. They deserve permanency. They deserve an individual in their lives [who is] able to provide them [with] the safety and

permanency that they need. The testimony presented was that the person who is meeting those needs at this time is [foster] parent.

\*\*\*

I do believe [Mother] wants what's best for [C]hildren, but the evidence and testimony presented today is sufficient to show that she does lack the capacity to understand how to properly care for [C]hildren, even in a supervised setting.

\*\*\*

[Mother] has not exhibited an ability to provide the necessary parental care and control necessary to parent [C]hildren, and in fact, the testimony of the … parenting capacity evaluator[, Dr. Salima,] and the [CUA] supervisor[, Mr. Williams,] was that they would have concerns recommend[ing] unsupervised contact without the services recommended being in place.

*Id.* at 96, 98, 101-02.

Children's counsel stated that he was "in agreement" with counsel for DHS. *Id.* at 102.

In contrast, Mother's counsel argued that Mother's rights should not be terminated because Mother "needs additional services." *Id.* at 102-03. Mother's counsel asserted that Mother was not provided with services in a timely fashion, and "if she ha[d] the proper support, we wouldn't be here right now." *Id.* at 103. Counsel added that Mother was "fully compliant, and she's done everything that has been asked of her." *Id.* She stated:

[Additional] referrals were never made, … but they should've been, and I think that we'd be in a different place right now if [Mother] had been given enough services, and if she was just given a little more time now, she could get those services in place. And we ask you not to terminate her rights.

*Id.*

Shortly thereafter, the trial court announced: "I take no pleasure in reaching my conclusions today, but I find that [DHS] has met its burden to involuntarily terminate the rights of [M]other under [Section] 2511(a)(1), (a)(5), and (a)(8), as well as 2511(b)." *Id.* at 104. On February 28, 2024, the trial court entered the decrees terminating Mother's parental rights.

Mother timely filed notices of appeal and concise statements of errors pursuant to Pa.R.A.P. 1925(a)(2)(i) at each child's docket.[3] Rather than author an opinion, the trial court issued an order stating that the hearing transcript "details the testimony and evidence that led to the trial court's final determinations." Notice of Compliance with Pa.R.A.P. 1925(a), 4/1/24, at 1-2 (unnumbered).

## ISSUES

Mother presents the following issues for review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[] pursuant to 23 Pa.C.S.[ §] 2511(a)(1)[,] where Mother presented evidence that she was fully compliant with her [Single Case Plan (SCP)] goals and was performing her parental duties.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[] pursuant to 23 Pa.C.S.[ §] 2511(a)(5)[,] where evidence was provided to establish that [C]hildren w[ere] removed from the care of Mother and Mother would be capable of caring for [C]hildren with all necessary service and supports.

_____

[3] On March 18, 2024, this Court consolidated the appeals *sua sponte*.

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[] pursuant to 23 Pa.C.S.[ §] 2511(a)(8)[,] where evidence was presented to show that Mother would be capable of caring for [C]hildren with the additional supports and services.

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[] pursuant to 23 Pa.C.S.[ §] 2511(b)[,] where evidence was presented that established [C]hildren had lived with their Mother for the part [*sic*] of their lives and Mother maintained that parental bond by visiting with [C]hildren.

Mother's Brief at 7.

ANALYSIS

*A. Standard of Review*

DHS, as petitioner, must prove by clear and convincing evidence that its asserted grounds for termination are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). The trial court is free to believe all, part, or none of the evidence, make credibility determinations, and resolve conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If the evidence supports the trial court's findings, this Court will affirm the decision, even if the record could support an opposite result. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003). We have explained:

Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial

- 8 -

courts, who often observe the parties first-hand across multiple hearings.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).

The Pennsylvania Supreme Court has instructed:

[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826–27 (Pa. 2012) (citation omitted).

*B. Statutory Authority*

Section 2511 of the Adoption Act applies to termination of parental rights and provides for a bifurcated analysis. First, the trial court must focus on the parent's conduct and "the eleven enumerated grounds" for termination in 23 Pa.C.S. § 2511(a). ***Id.*** at 830. If the court finds grounds for termination under Section 2511(a), it must assess evidence of the children's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with [the] decision as to any one subsection of [Section 2511(a), in addition to Section

2511(b),] to affirm the termination of parental rights." ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

      1.   *Section 2511(a) Grounds for Termination*

Instantly, we examine subsection 2511(a)(8), which provides for termination when:

> (8) The child has been removed from the care of the parent by the [trial] court …, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Mother claims the evidence "indicated [M]other … is dealing with the issues that led to [C]hildren's placement[,] and is fully compliant with her [] goals." Mother's Brief at 12. Mother states she "has benefitted from the programs she was referred to." ***Id.*** at 18. However, Mother also asserts that "reasonable" reunification efforts "were never provided to this family." ***Id.*** According to Mother, if she "is referred for the appropriate services, she should have the current capacity to care for [C]hildren." ***Id.*** Mother concludes that grounds "do not exist to terminate her rights under subsection 2511(a)(8)[,] because Mother was never provided reasonable efforts to reunify with [C]hildren[,] and she should be capable of caring for [C]hildren once all appropriate referrals have been made." ***Id.*** This argument is inconsistent with the record and law.

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." ***In re A.R.***, 837 A.2d 560, 564 (Pa. Super. 2003). Section 2511(a)(8) "does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement[,] or the availability or efficacy of [DHS] services." ***In re C.B.***, 230 A.3d 341, 348 (Pa. Super. 2020) (citations omitted). Rather, "in determining whether the conditions that led to removal and placement continue to exist, '[t]he relevant inquiry … is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing.'" ***Id.*** at 348–49 (citation omitted). Pertinently:

> By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

***Id.*** at 349 (citation omitted).

It is undisputed that more than 12 months had passed since Children were removed from Mother's care. ***See*** N.T., 2/28/24, at 106 (trial court noting that Children had been in care for 16 months). Also, the conditions which led to Children's placement continued to exist. For example, Dr. Salima testified that "the matters that are affecting [Mother's] capacity are organic and enduring in nature. So, completing services that are time-limited are not

expected to be useful in fully addressing the capacity issue." ***Id.*** at 27. As to Children's needs and welfare, Mr. Williams opined that termination was in Children's best interest because they are bonded with their foster parent and deserve stability. ***Id.*** at 59-60.

The trial court "took no pleasure" in finding that DHS "met its burden to involuntarily terminate the rights of [M]other under [Section] 2511(a)(1), (a)(5), and (a)(8), as well as 2511(b)." ***Id.*** at 104. Nonetheless, in addressing subsection 2511(a)(8), the trial court stated:

> I do clearly find that it has been more than 12 months since the removal and placement. The conditions today are somewhat the same as they were when [C]hildren came into care, in that [M]other has not demonstrated the parental capacity to care for these [C]hildren, by her own admission.
>
> She's not ready to have both [C]hildren in her life together. And I commend her for acknowledging those limitations, but at the same time, this is the same limitation that brought the case … in over 12 months ago.
>
> And, again, I find termination of parental rights would best serve [Children's] needs and welfare, as these are two young [C]hildren who have been in care the majority of their lives at this point.

***Id.*** at 107-08.

The evidence supports the trial court's conclusion. Therefore, the trial court did not err or abuse its discretion in terminating Mother's parental rights under Section 2511(a)(8).

2. *Section 2511(b) Needs and Welfare*

Mother argues, in two imprecise paragraphs, that the trial court abused its discretion by finding that termination meets Children's needs and welfare

under Section 2511(b). Mother's Brief at 19. Mother claims she "consistently maintained her parental bond through her supervised visits and family school." *Id.* at 19. Without further explanation, Mother asserts "the requirements of subsection 2511(b) are not met because the best interests of [C]hildren are not served by termination of Mother's parental rights." *Id.* This argument is unavailing.

The trial court, "in terminating the rights of a parent[,] shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However,

> the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. Importantly, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship.

*In re Adoption of A.H.*, 247 A.3d 439, 445 (Pa. Super. 2021) (citations omitted).

Here, the trial court explained:

> [M]other loves [C]hildren, but they do not have a parent-child or a necessary bond with [M]other. The necessary bond that they've developed is with the [foster] parent, who's been meeting all of

- 13 -

their needs, and who [C]hildren look to to meet all of the needs that a parent provides to a child.

That is not the relationship [M]other has [with Children]. [C]hildren may enjoy seeing [M]other as a visitation resource, but they [do] not hav[e] a necessary bond, and I don't find [Children] would suffer irreparable harm if this relationship [is] terminat[ed].

N.T., 2/28/24, at 108-09.

The record supports this conclusion. With respect to B.A.D., Mr. Williams stated:

[B.A.D.] doesn't bond with [M]other, but he does look at the [foster] parent as his mother[; B.A.D. has] been in the home over a year now. [H]e is young. Due to his age, he is still young enough that he … look[s to the foster parent] as the mother.

So, there might be an adjustment issue[,] but [B.A.D.] look[s] at [the foster parent] as the mother. So, that's why I don't think th[ere] would be irreparable harm [in terminating Mother's parental rights].

*Id.* at 55.

Mr. Williams testified similarly regarding B.V.F. He stated:

[H]e's very young and, again, … he looks at [foster] parent as a mother. And … he looks at the [foster] parent as the primary caregiver.

[H]e has a bond with the [foster] parent[,] … a mother and child bond. He looks … to the [foster] parent … to daily provide and care … 24/7….

*Id.* at 57.

Mr. Williams opined that Children would be impacted negatively if they were removed from the foster parent's home. He stated that Children need stability, "they're thriving," and "that's their mother." *Id.* at 58. Mr. Williams explained he was advocating for termination,

for permanency reasons and stability, [Children] need to be stable. They shouldn't be in the child welfare system if they have … the [foster parent, who] is an adoptive resource.

It's not fair for [Children] to stay in the system, [especially considering] their bond with the [foster parent].

*Id.* at 59-60.

Ms. Dennis-Walton, on the day before the hearing, had observed the Children at home with the foster parent. *Id.* at 74. Ms. Dennis-Walton testified that the foster parent provided for Children's needs. *Id.* She stated:

a lot of times, [Children] are playing with themselves. They like to roughhouse and everything. But when they do interact with [foster] parent, they … run over toward [her,] they call her mom. They [] call her mom, and just kind of look to her to, like – they're kind of clingy, a little bit, but, like … all little kids.

*Id.* at 72. Ms. Dennis-Walton opined that because of their bond with the foster parent, Children would be negatively impacted if they were removed from her care. *Id.* at 73.

Recently, the Pennsylvania Supreme Court reiterated that the parental bond "is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *K.T.*, 296 A.3d at 1113. The Supreme Court explained:

The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law[, the Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster

- 15 -

home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. *See T.S.M.*, 71 A.3d at 268–69 ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved."). Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

*Id.* (footnotes omitted).

In this case, Children are bonded with the foster parent and view her as their mother.[4] The foster parent has provided stability and meets Children's daily needs. Accordingly, the trial court did not err or abuse its discretion by terminating Mother's parental rights under Section 2511(b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/18/2024

_____

[4] Mr. Williams testified that Mother and the foster parent "have a good relationship." N.T., 2/28/24, at 52.

- 16 -